**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED NATIONAL INSURANCE CO., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-04-2924 |
| | § | |
| MOTIVA ENTERPRISES, L.L.C. AND | § | |
| HYDRO TANK, INC., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This is an insurance coverage dispute arising out of injuries three employees of Hydro

Tank, Inc. suffered on July 30, 2002, while removing petroleum waste materials from a fuel-

mixing tank so the tank could be cleaned and the materials recycled or discarded.  The tank

was located at a petroleum refinery in Port Arthur, Texas.  The employees were working

under a March 2002 contract between the premises owner, Motiva Enterprises, L.L.C., and

Hydro Tank.  In that contract, Hydro Tank agreed to obtain a commercial general liability

(CGL) insurance policy with limits of not less than $1 million per occurrence and $1 million

general aggregate, naming Motiva as an additional insured.  Hydro Tank obtained a CGL

Policy from American Equity with $1 million limits and an umbrella policy from United

National Insurance Company with $5 million limits.  In this declaratory judgment action,

United National Insurance has moved for summary judgment on two grounds.  First, United

National asserts that Motiva is not an "insured" covered under the United National Policy

issued to Hydro Tank.  Second, United National asserts that the  pollution exclusion in its Policy  bars coverage for the underlying *Durisio* plaintiffs' claims.  (Docket Entry Nos. 16, 47).  Motiva has filed responses, (Docket Entry Nos. 20, 58), to which United National has replied, (Docket Entry No. 68), and Motiva has surreplied, (Docket Entry No. 70).  Motiva has also filed a motion for leave to file a Second Amended Answer, (Docket Entry No. 35), to which United National has responded, (Docket Entry No. 39).  Motiva has also filed a motion to strike certain summary judgment evidence submitted by United National, (Docket Entry No. 57), to which United National has responded, (Docket Entry No. 64).  United National has also filed a request for judicial notice, (Docket Entry No. 65), to which Motiva has responded, (Docket Entry No. 69).

Based on the motions and the pleadings, the record, and the controlling law, this court denies United National's motion for partial summary judgment on the basis that Motiva is not an insured under the Policy; denies Motiva's motion for leave to file a second amended answer as moot; denies Motiva's motion to strike; denies United National's request for judicial notice; and grants United National's motion for summary judgment based on the pollution exclusion.  The reasons are explained below.[1]

---

[1]     This case had been stayed.  (Docket Entry No. 56).  After the case was transferred to this court, and after hearing from the parties at a status conference on October 11, 2005, this court agreed to address the summary judgment motions.  Upon entry of this Memorandum and Opinion, the stay is lifted.

## I.      Background

### A.      The Parties and the *Durisio* Lawsuit

Motiva Enterprises, L.L.C. is a petroleum manufacturer with a refinery in Port Arthur, Texas.  In the Spring of 2002, Motiva decided to destroy certain tanks used at the Port Arthur premises.  Motiva contracted out the task of cleaning the tanks.  Hydro Tank won the bid. In its May 2002 contract with Motiva, Hydro Tank agreed to obtain certain insurance naming Motiva as an additional insured and agreed to indemnify Motiva for losses arising out of the work Hydro Tank performed on Motiva's premises.  (Docket Entry No. 47, Ex. B-1).  Hydro Tank obtained an umbrella liability insurance policy from United National Insurance Company with $5 million limits,[2] and a commercial general liability policy from American Equity with $1 million limits.[3]  The American Equity Policy was designated as "underlying insurance" on the United National Policy Schedule of Underlying Insurance.

On July 30, 2002, Hydro Tank employees Kevin Washington and Jeffrie Sayrie entered a mix tank adjacent to tank number 1603.  The mix tank received the residual material pumped out of tank 1603, which had been damaged and was slated for demolition. The "sludge" pumped into the mix tank was waste, to be collected and reused in the Motiva refinery or disposed of, so that the tank could be removed from the Motiva job site.  The mix tank was approximately 8 feet wide, 20 feet long, and 10 feet deep.  The top was half covered

---

[2]      United National Policy  Number CU 78355, issued on August 20, 2002.

[3]      American Equity Policy Number ACC173232, issued on January 4, 2002.

by a "shaker screen" and the remaining half by a steel grate.  The top of the mix tank was not enclosed, but the interior of the tank was a confined space.

The materials pumped from tank 1603 to the mix tank included the No. 6 fuel oil normally stored in the tank and FC light cycle oil, or cutter stock, added to the fuel oil residual to make it "more pumpable."  The summary judgment record includes Material Safety Data Sheets for both the fuel oil and the cutter stock.  The MSDS for the delayed coker charge states that this product "may release hydrogen sulfide gas."  The MSDS for FC light cycle oil states that the product contains .02 to 1.39 % by volume benzene and .02 to .03 % by volume hydrogen sulfide and that "Hydrogen Sulfide and other hazardous vapors may evolve and collect in the headspace of storage tanks or other enclosed vessels."  The MSDS also states that "[v]aporization of H2S and that has been trapped in clothing can be dangerous to rescuers."  (Docket Entry No. 44, Aff. of William R. Wilder, ¶ 9 & Ex. A-4). In recognition of these risks, the tank was equipped with monitors to detect hydrogen sulfide gases.  Readings were taken just above the surface of the sludge.  (*See, e.g.*, Docket Entry No. 58, Ex. B-3, Dep. of Felix Solis, at 35–36).

On July 30, 2002, in the afternoon, Hydro Tank employees Washington and Sayrie entered the tank carrying shovels and a five-gallon bucket.  Their task was to shovel the hard sludge that was underneath a layer of liquid on the bottom of the mix tank, have the bucket hauled to the top of the tank and emptied, and repeat the process.  The men wore protective clothing, gloves, and a face respirator, although the respirator was not designed to protect against hydrogen sulfide gas.  Workers took readings from monitors located on and in the

tank and found no elevated levels of toxic substances.  The two men were in the tank long enough to fill the five-gallon bucket with sludge and have the bucket hauled to the top of the tank.  A few minutes later, a man on the top of the tank grid, William Harper, noticed that the two men inside the tank had collapsed.  Jimmy Durisio entered the tank to help them.  He found Washington lying face down in the sludge.  Sayrie was nearby, with his face partially in the sludge.  Durisio was able to lift them both and, with help from others, removed them from the tank.  All three were taken to the hospital.

The evidence as to the nature of their immediate and long-term physical and mental states is conflicting, but Washington and Sayrie both assert that they suffered severe brain damage from exposure to toxic chemicals and vapors in the tank and are permanently disabled.  Durisio asserts that he suffered back and pulmonary injuries as well as some neurological effects in rescuing the men.  The record reflects that some of the emergency responders reported feeling nauseous and dizzy and also received medical attention on the date of the incident.  Monitor readings taken after the incident did not show elevated levels of toxic substances in the mix tank.  The record reflects conflicting inferences from these readings, ranging from finding support for the absence of hydrogen sulfide vapors in the tank during the incident to explaining that hydrogen sulfide vapors quickly dissipate and the readings were taken too long afterwards to be a useful indicator of conditions during the incident.

All three employees filed suit (the *Durisio* suit) against Motiva in the state district court of Jefferson County, Texas.  In the original and first seven amended petitions, plaintiffs

alleged that Motiva had committed a number of negligent acts that caused plaintiffs' injuries and damages.  In the eighth amended petition, the plaintiffs included allegations against Motiva for its own negligence.  Plaintiffs alleged that they "were caused to sustain serious injuries while working in a tank when they were exposed to toxic levels of hydrogen sulfide and/or other chemicals and vapors."  (Docket Entry No. 47, Ex. B-2 at ¶ 3.03).  Plaintiffs alleged that Motiva "instructed Plaintiffs to enter the tank to 'clean it' and . . . brought to Plaintiffs several buckets in which to fill the sludge from the mix tank. . . .  Plaintiffs . . . became overcome by chemicals and toxins owned by Defendant, Motiva Enterprises, L.L.C., causing brain injury and damage."  (*Id.*).  The *Durisio* plaintiffs alleged that Motiva "owned the product which was in the mix tank to which it refers to as hydrocarbon 'sludge.'  The sludge was known to Defendant, Motiva Enterprises, L.L.C. to contain hydrogen sulfide; however, Defendant nevertheless instructed Plaintiffs, Jeffrey Durisio[4] and Kevin Washington, to enter the mix tank."  (*Id.*).

In the eighth amended petition, unlike the earlier petitions, plaintiffs added an allegation that Motiva was vicariously liable for Hydro Tank's acts or omissions that had caused the injuries and damages.  The significance of this added allegation is that the additional insured endorsement of the United National Policy states that it does not apply if "liability for injury or damage is imposed or sought to be imposed on the additional insured because of its own acts or omissions. . . ."  (Docket Entry No. 20, Ex. A).  That endorsement

---

[4]    This appears to be a drafting error.  The other allegations assert that Motiva ordered Sayrie and Washington, not Durisio and Washington, into the mix tank, and Durisio later entered to rescue them.

also states that "[i]f an agreement between the named insured and the additional insured promising indemnity and/or contribution in favor of the additional insured exists or is alleged to exist, the extent and scope of coverage under this insurance for the additional insured will be no greater than the extent and scope of indemnification of the additional insured which was agreed to by the named insured." (*Id.*). The indemnity provision in the March 2002 agreement between Hydro Tank and Motiva states in relevant part that Hydro Tank "shall protect, defend, indemnify and hold harmless" Motiva, from any losses, damages, suits, and expenses (including attorney's fees) "that arise out of or on account of any . . . services performed by [Hydro Tank] on [Motiva's] premises, . . . that involve . . . injury . . . to any person . . . ." (Docket Entry No. 47, Ex. A-55 at AE0043). The provision states that Hydro Tank's indemnification obligation is "without regard to whether negligence, fault, or strict liability of an indemnified party is a concurrent or contributory factor." (*Id.*).

Motiva settled the *Durisio* lawsuit with the three employees and sought indemnity under the United National Policy, requesting the Policy limit of $5 million. United National denied the claim and filed this lawsuit for a judgment declaring that it owes no obligation under the Policy. A related coverage dispute is pending in Jefferson County, Texas state court, relating to the American Equity Policy's application to the loss. For the purpose of the federal suit, however, the parties have stipulated that United National does not dispute Motiva's "contention that American Equity Policy No. ACC173232 provides valid and collectible coverage to Motiva for the claims of the Duriso plaintiffs and for Hydro Tank's liability to Motiva." The parties have also stipulated that for the purpose of the federal suit,

United National does not dispute Motiva's contention that the "indemnity contract between Hydro Tank and Motiva is valid and enforceable against Hydro Tank and that Hydro Tank agreed to defend and indemnify Motiva against the claims in the Duriso lawsuit." Additionally, United National agreed that this court "may assume Motiva would have valid and collectible coverage under the American Equity Policy for the claims of the Duriso plaintiffs and for Hydro Tank's liability to Motiva and that Motiva would be able to enforce the Indemnity Contract against Hydro Tank and that Hydro Tank agreed to defend and indemnify Motiva against the claims in the Duriso lawsuit."  (Docket Entry No. 55, Ex. A).

**B.    The United National Policy Terms**

United National's Policy issued to Hydro Tank on August 20, 2002 and was effective on the date of the incident.  The commercial umbrella liability policy includes the following provisions relevant to this litigation:

    2.    Exclusions

        \*\*\*\*

        f.    (1)    "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threateded [sic] discharge, seepage, migration, dispersal, release, or escape of "pollutants" at any time.

             (2)    Any loss, cost or expense arising out of any:

                    (a)    Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to, or assess the effects of "pollutants"; or;

(b)     "Claim" or "suit" by or on behalf of any governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  "Waste" includes materials to be recycled, reconditioned, or reclaimed.

(Docket Entry No. 47, Ex. A-1, 2–3).

Section III – Who Is An Insured

****

2.      Except with respect to:

a.      Any "auto," or

b.      "Mobile equipment" registered in your name under any motor vehicle registration law;

each of the following is also an insured:

****

e.      Any person or organization qualifying as an insured under any policy of "underlying insurance".  Coverage afforded under such insurance under this policy applies only to injury or damage:

(1)     Which is covered by this policy; and

(2)     Which is covered by the "underlying insurance" or would be covered but for the exhaustion of such policy's limits of insurance.

This policy does not afford such person or organization limits of insurance in excess of the lessor of:

(1)     The minimum limit of insurance you agreed to provide; or

        (2)     The limit of insurance under this policy.

    f.     Any person or organization for whom you have agreed in writing prior to any "occurrence" or "offense" to provide insurance such as is afforded by this policy, but only with respect to operations performed by you or on your behalf, or facilities owned or used by you.  This policy does not afford such person or organization limits of insurance in excess of the lessor of:

        (1)     The minimum limit of insurance you agreed to provide; or

        (2)     The limit of insurance under this policy.

(*Id.* at 6–7).

As noted, the United National Policy also includes an additional-insured endorsement, which reads:

Who is an insured is amended to include the person or organization shown in the Schedule below, but only as respects liability imposed or sought to be imposed on such additional insured because of an alleged act or omission of the named insured:

    1.     If liability for injury or damage is imposed or sought to be imposed on the additional insured because of:

        a.     Its own acts or omissions, this insurance does not apply;

        b.     Its acts or omissions and those of the named insured, as to defense of the additional insured, this insurance will act as coinsurance with any other insurance available to the additional insured, in proportion to the limits of liability of all involved policies, and the Other Insurance provisions of this policy . . . are amended accordingly. However, this insurance does not apply to indemnity of the additional insured for its own acts or omissions.

    2.     If an agreement between the named insured and the additional insured providing indemnity or contribution in favor of the

> additional insured exists or is alleged to exist, the extent and scope of coverage under this insurance of the additional insured will be no greater than the extent and scope of indemnification of the additional insured which was agreed to by the named insured.

(Docket Entry No. 20, Ex. A).  The Schedule in the endorsement is listed as "BLANKET." (*Id.*).

Under its contract with Motiva, Hydro Tank also obtained a $1 million CGL policy from American Equity Insurance Company.  (Docket Entry No. 47, Ex. B-1 at ¶ 15).  As specified by the Motiva contract, Hydro Tank designated the American Equity Policy as "underlying insurance" to the United National Policy.

## II.     The Controlling Legal Standards

### A.     Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the

nonmovant's response. *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See id*. The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986).

In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

### B.   Texas Insurance Law

In this diversity case, Texas law applies. *See, e.g.*, *Cleere Drilling Co. v. Dominion Exploration & Prod., Inc.*, 351 F.3d 642, 646 (5th Cir. 2003). Interpretation of a contract is a question of law. *Royal Ins. Co. of Am. v. Hartford Underwriters Ins. Co.*, 391 F.3d 639, 641 (5th Cir. 2004); *Fisk Elec. Co. v. Constructors & Assoc., Inc.*, 888 S.W.2d 813, 815 (Tex. 1993). Insurance policies are interpreted using the rules governing contract interpretation. *Valmont Energy Steel, Inc. v. Commercial Union Ins. Co.*, 359 F.3d 770, 773 (5th Cir. 2004) (citing *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 740–41 (Tex. 1998)). The goal in construing an insurance contract is to ascertain "the true intent of the parties as expressed in the instrument." *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). The policy should be considered as a whole, giving each part effect and meaning and rendering no provision superfluous. *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.*, 99 F.3d 695, 700 (5th Cir. 1996).

"If an insurance contract is expressed in unambiguous language, its terms will be given their plain meaning and it will be enforced as written." *Certain Underwriters at Lloyd's London v. C.A. Turner Constr. Co., Inc.*, 112 F.3d 184, 186 (5th Cir. 1997). The court cannot look to parol evidence to determine the meaning of the insurance contract unless the court first determines that the insurance contract is ambiguous. *See Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520. "Language in insurance provisions is only ambiguous if the court is uncertain as to which of two or more meanings was intended." *St. Paul Fire & Marine Ins. Co. v. Green Tree Fin. Corp.*, 249 F.3d 389, 392 (5th Cir. 2001). "If the court finds an ambiguity in the contract provisions, particularly in an exclusion clause, the court should

construe the policy strictly against the insurer." *Valmont Energy Steel, Inc.*, 359 F.3d at 774 (citations omitted).

"An insurer's duty to defend and its duty to indemnify are distinct and separate." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 468 (5th Cir. 2002) (citing *Farmers Tex. County Mut. Ins. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997); *E&L Chipping Co. v. Hanover Ins. Co.*, 962 S.W.2d 272, 274 (Tex. App. – Beaumont 1998, no pet.); *Argonaut Sw. Ins. Co. v. Maupin*, 500 S.W.2d 633, 636 (Tex. 1973)).  The duty to defend is broader than the duty to indemnify.  *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 552 (5th Cir. 2004) (citing *Potomac Ins. Co. v. Jayhawk Med. Acceptance Corp.*, 198 F.3d 548, 551 (5th Cir. 2000)).  "The duty to indemnify arises from the actual facts that are developed to establish liability in the underlying suit." *Quorum Health Res., L.L.C.*, 308 F.3d at 468 (citing *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821 (Tex. 1997) (additional citations omitted)).  An insured may have a duty to defend but, ultimately, no duty to indemnify.  *Id.* (citing *Griffin*, 955 S.W.2d at 82).

Under the Texas "eight corners" or "complaint allegation" rule, this court must compare the allegations in the most recent amended petition filed in the underlying suit against the insured with the provisions of the insurance policy to determine if the allegations "fit within the policy coverage." *Quorum Health Res., L.L.C.*, 308 F.3d at 468.  "The duty to defend analysis is not influenced by facts ascertained before suit, developed in the process of litigation, or by the ultimate outcome of the suit." *Id.*  This court may look to extrinsic evidence only if the relevant pleading in the underlying case "'does not contain sufficient

14

facts to enable the court to determine if coverage exists.'" *Id.* (quoting *W. Heritage Ins. Co. v. River Entm't*, 998 F.2d 311, 313 (5th Cir. 1993)).   In an insurance coverage dispute analyzed under the eight corners rule, the insured party — here, Motiva — bears the initial burden of showing that there is coverage, while the insurer — United National — bears the burden of showing that any exclusion in the policy applies.  If any allegation in the complaint is even potentially covered by the policy and not excluded, the insurer has the duty to defend. *Id.*  Conversely, an insurer is not required to defend if the complaint only alleges facts excluded by the policy.  *Id.*; *Lafarge Corp. v. Hartford Cas. Ins. Co.*, 61 F.3d 389, 393 (5th Cir. 1995).

## III.    Analysis

### A.    Whether Motiva Is an "Insured"

United National first argues that Motiva is not an "insured" under the Policy.  (Docket Entry No. 16).  United National specifically argues that Motiva is not entitled to recover under the United National Policy because Motiva is only entitled to the limits of coverage that Hydro Tank was entitled to obtain under its agreement with Motiva, which was a CGL policy of at least $1 million in limits.  The parties have stipulated that Motiva's losses from the *Durisio* lawsuit are within the American Equity Policy coverage — up to the limits of $1 million — and that Motiva has a valid indemnity agreement against Hydro Tank for the claims in the *Durisio* lawsuit.

The first paragraph of the additional insured endorsement of the United National Policy defines an "insured" as including a party that is held alleged to be or is liable because

of an "alleged act or omission of the named insured," Hydro Tank.  The second paragraph states that if the named and additional insured have an indemnity agreement in favor of the additional insured, "the extent and scope of coverage under this insurance of the additional insured will be no greater than the extent and scope of indemnification of the additional insured which was agreed to by the named insured."  Paragraph III.2.f. of the United National Policy, which defines "who is an insured," states that an "insured" party includes:

> Any person or organization for whom you have agreed in writing prior to any "occurrence" . . . to provide insurance such as is afforded by this policy, but only with respect to operations performed by you or on your behalf, or facilities owned or used by you.  This policy does not afford such person or organization limits of insurance in excess of the lessor of
>
> (1)  The minimum limit of insurance you agreed to provide; or
>
> (2)  The limit of insurance under this policy.

(DE 20, Ex. A, at M002007, M002033).

United National's argument that Motiva is not an "insured" is not supported by the Policy terms.  Motiva is an additional insured under the endorsement because the eighth amended petition in the *Durisio* lawsuit sought to hold Motiva vicariously liable for Hydro Tank's acts and omissions.  The *Durisio* lawsuit sought to hold Motiva liable for the actions of Hydro Tank, which directed the tank cleaning operation.  (*See* Docket Entry No. 47, Ex. B-2 at ¶ 4.024 ("Defendant, Motiva Enterprises, L.L.C. was responsible for Plaintiffs'/Intervenors' injuries and damages and vicariously responsible for any acts of Hydrotank [sic], Inc., which were a proximate cause of the incident and/or injuries made the basis of this litigation.")).  Under this endorsement, which is part of the policy, Motiva is an

"insured" under the United National policy.  *Cf.  Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 491–92 (5th Cir. 2000); *Admiral Ins. Co. v. Trident NGL, Inc.*, 988 S.W.2d 451, 452–54 (Tex. App. – Houston [1st Dist.] 1999, pet. denied).

Motiva is also an additional insured under paragraph 2 of the endorsement because there was an indemnity agreement between Hydro Tank and Motiva, in Motiva's favor.  This provision states that the extent and scope of Motiva's coverage as an additional insured will be no greater than the extent and scope of indemnification that Hydro Tank agreed to provide Motiva.  The parties have stipulated for the purposes of this lawsuit that the indemnity contract between Hydro Tank and Motiva is valid and enforceable and applies to the claims against Motiva in the *Duriso* lawsuit.  Hydro Tank did not limit the amount of its indemnification obligation to Motiva in the May 2002 agreement.  Neither of these provisions supports United National's argument that Motiva is not an insured or that Motiva's right of recovery is limited to the $1 million limit under the American Equity Policy.

United National argues that under paragraph III.2.e of the Policy, Motiva's losses for the *Durisio* claims are not covered under the United National Policy.  United National argues that under paragraph III.2.e, the Policy does not provide Motiva "limits of insurance in excess of . . .[t]he minimum limit of insurance [Hydro Tank] agreed to provide"; that Hydro Tank agreed to and did provide the American Equity Policy, which has a $1 million limit, and which was scheduled as underlying insurance to United National's umbrella policy; and that given the parties' stipulation that Motiva is insured for the *Durisio* losses under the

American Equity Policy, Motiva can only recover the $1 million available under that Policy. United National's argument is not persuasive.  The Policy terms do not make the United National Policy coverage available only in the event Motiva is unable to recover from American Equity.  Rather, under the Policy terms, United National must pay for Motiva's losses that are covered by the American Equity Policy but exceed its limits, up to  $1 million in coverage (the minimum limit of insurance that Hydro Tank agreed to provide).  In other words, the language of III.2.e, if applicable, limits the extent of United National's exposure to Motiva, but does not preclude coverage or deny Motiva the status of an "insured."  United National's motion for partial summary judgment on the ground that Motiva was not an "insured" under the Policy is denied.[5]

### B.        Whether the Pollution Exclusion Precludes Coverage

United National also seeks summary judgment on the ground that Motiva's losses falls within the Policy's "pollution" exclusion.  (Docket Entry No. 47).  Motiva responds with several arguments.  (Docket Entry Nos. 58, 70).  First, Motiva argues that the sludge was not a "pollutant" as defined by the Policy.  Second, Motiva argues that fact issues remain as to: (1) why the *Durisio* plaintiffs collapsed; and (2) whether the *Durisio* plaintiffs' injuries resulted from exposure to sludge.  Finally, Motiva contends that the Contractors' Limitation Endorsement in the United National Policy negates any possible effect of the pollution exclusion.

---

[5]        Because the Policy included Motiva as an "insured," Motiva's motion for leave to file a Second Amended Answer, (Docket Entry No. 35), in which Motiva proposed additional defenses to United National's argument, is moot.

The pollution exclusion in the United National Policy is broad:

> "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened [sic] discharge, seepage, migration, dispersal, release, or escape of "pollutants" at any time.

(Docket Entry No. 47, Ex. A-1 at 2–3).  The definition of "pollutant" is also broad:

> "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  "Waste" includes materials to be recycled, reconditioned, or reclaimed.

(*Id.* at 3).

Similar provisions have been deemed unambiguous by numerous Texas courts and the Fifth Circuit.  *See Amoco Prod. Co. v. Hydroblast Corp.*, 90 F. Supp. 2d 727, 732–33 (N.D. Tex. 1999), *aff'd*, 226 F.3d 642 (5th Cir. 2000); *Certain Underwriters at Lloyd's London v. C.A. Turner Construction Co.*, 112 F.3d 184, 187 n.4 (5th Cir. 1997) (listing approximately fifteen cases from various jurisdictions, all interpreting the pollution exclusion clause as unambiguous); *Bituminous Cas. Co. v. Kenworthy Oil Co.*, 912 F. Supp. 238, 240 (W.D. Tex. 1996), *aff'd*, 105 F.3d 656 (5th Cir. 1996); *Hamm v. Allstate Ins. Co.*, 286 F. Supp. 2d 790, 793–94 (N.D. Tex. 2003); *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 519 (Tex. 1995); *Zaiontz v. Trinity Universal Ins. Co.*, 87 S.W.3d 565, 571–74 (Tex. App. – San Antonio 2002, rev. denied); *Reddy Ice Corp. v. Travelers Lloyd Ins. Co.*, 145 S.W.3d 337, 340 n.2 (Tex. App. – Houston [14th Dist.] 2004, rev. denied); *Allen v. St. Paul Fire & Marine Ins. Co.*, 960 S.W.2d 909, 911–12 (Tex. App. – Texarkana 1998, no pet.).  Motiva

does not argue that the pollution exclusion is ambiguous.  This court agrees that the provisions are unambiguous and that resort to parol evidence is not needed.

The parties disagree over the application of the unambiguous pollution exclusion to this case.  United National relies on the eighth amended petition filed in the *Durisio* litigation in support of its argument that the allegations in this case trigger the pollution exclusion. Motiva argues that because the petroleum sludge in the mixing tank was contained where it was supposed to be, it was not itself a "pollutant," and that the *Durisio* plaintiffs did not plead facts that preclude coverage.

The eighth amended complaint in the *Durisio* litigation specifically alleges that Motiva owned the "sludge" in the mix tank and that "[t]he sludge was known to Defendant, Motiva Enterprises, L.L.C. to contain hydrogen sulfide."  (Docket Entry No. 47, Ex. B-2 at ¶ 3.03).  The eighth amended petition in the *Durisio* litigation specifically alleges that Motiva nevertheless instructed two of the defendants to enter the mix tank and that the plaintiffs' injuries "were caused . . . when they were exposed to toxic levels of hydrogen sulfide and/or other chemicals or vapors" in the tank.  (*Id.*).  The petition alleges that "after Plaintiffs, Jeffrey Sayrie and Kevin Washington, had filled one bucket, they were overcome and caused to fall in the tank."  (*Id.*).  The petition alleges that the defendants sustained "serious injuries and damages while working in a tank when they were exposed to toxic levels of hydrogen sulfide and/or other chemicals and vapors.  On the date of the incident. . . Plaintiffs . . . became overcome by chemicals and toxins owned by the Defendant . . . causing brain injury and damage".  (*Id.*).  The eighth amended petition alleges that exposure to toxic levels of

hydrogen sulfide and other chemicals or vapors  caused plaintiffs to sustain disabling brain damage and injury.

Motiva argues that the *Durisio* plaintiffs did not plead that they had been injured by a "pollutant."  They move to strike three paragraphs of an affidavit filed by William R. Wilder, Ph.D., a biochemist, on behalf of United National.  In the affidavit, Dr. Wilder stated that the sludge and materials handled during the project of cleaning the mix tank could release hydrogen sulfide, benzene, and other volatile and semi-volatile hydrocarbon compounds, and that all three were contaminants or pollutants as defined in the Policy's pollution exclusion.  The opinions as to the nature of the components of the sludge are not conclusory nor outside Dr. Wilder's expertise.  To the contrary, the record includes Material Data Safety Sheets for the two substances making up the "sludge" identifying both hydrogen sulfide and benzene as components and describing their toxic qualities.  Although this court need not rely on the challenged portions of the affidavit to resolve the coverage issue, the motion to strike is denied.[6]

The Policy defines "pollutant" broadly, as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Docket Entry No. 47, Ex. A-1, at 2–3).  "Waste" includes materials to be recycled, reconditioned or reclaimed." (*Id.* at 3).  Contaminant and irritants are part of the definition

---

[6]    United National has filed a motion requesting this court to take judicial notice that hydrogen sulfide and benzene are both irritants or contaminants.  (Docket Entry No. 65).  A court cannot take judicial notice of a fact unless the question is beyond reasonable dispute.  FED. R. EVID. 201(b).  It is neither necessary nor proper for this court to resort to judicial notice.  Plaintiffs have alleged that they were harmed by exposure to toxic levels of these and other chemicals.  The motion for judicial notice is denied.

of "pollutants," not separate from or lesser in degree.  Cases construing similar clauses that use but do not define the terms "contaminant" or "irritant" use ordinary definitions, defining "to contaminate" as "to soil, stain, corrupt or infect by contact or association . . . to render unfit for use by the introduction of unwholesome or undesirable elements."  *Cleere Drilling Co. v. Dominion Exploration & Prod., Inc*., 351 F.3d 642, 652 (5th Cir. 2003).  "Irritation" is defined as, *inter alia*, "a condition of irritability, soreness, roughness, or inflammation of a bodily part."  WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 640 (9th ed. 1990).  The *Durisio* plaintiffs pleaded that they sustained brain damage as a result of exposure to toxic levels of hydrogen sulfide and other chemicals or vapors in waste material that they were walking through and shoveling up for recycling and disposal.  They alleged that they were exposed to "pollutants."

Motiva relies on *Certain Underwriters at Lloyd's London v. C.A. Turner Construction Co.*, 112 F.3d 184 (5th Cir. 1997).  In that case, the Fifth Circuit endorsed a "common-sense approach" to interpreting the term "pollutant" in a similar pollution exclusion clause.  *Id.* at 186–88.  In that case, however, unlike the present case, the insurance policy exclusion did not define the term "pollutant."  *Id.* at 186 ("Because the policy does not define 'pollution,' 'contamination,' or 'seepage,' they contend, the terms must be limited to their ordinary meaning.").  In this case, by contrast, the United National Policy did define "pollutant," and did so broadly.  In *C.A. Turner*, moreover, the focus of the court's opinion was to clarify that broad pollution exclusion clauses in CGL policies that by their terms applied to "liability for any bodily or personal injury" caused by pollution, contamination,

or seepage were not limited to the context of widespread environment discharges and harms but also applied to claims arising from a "simple workplace accident."  112 F.3d at 187.

Motiva relies on the following language quoted in *C.A. Turner Construction*:

> The terms "irritant" and "contaminant," when viewed in isolation, are virtually boundless, for "there is virtually no substance or chemical in existence that would not irritate or damage some person or property."  Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results.  To take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution.

*Id.* at 188 (quoting *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992) (additional citations omitted in original)).  In *C.A. Turner Construction*, the Fifth Circuit adopted this "common-sense" approach and applied it to hold that the pollution exclusion barred coverage for losses from a worker's injuries suffered when a discharge of phenol gas filled a tent in which he was welding pipe.  "The emission of the harmful fumes filled up a temporary plastic tent that enclosed scaffolding intended to support at least three people.  The scope of this release distinguishes it from the Seventh Circuit's example of the spill of a bottle of Drano and supports our conclusion."  112 F.3d at 188. Similarly, in the present case, the substances to which the *Durisio* plaintiffs alleged they were exposed are not slight exposures that would ordinarily cause no harm related to their

potential to irritate or contaminate.  Rather, the *Durisio* plaintiffs alleged that they were exposed to such high levels of toxic substances as to cause brain damage.  Considering the allegations in the eighth amended petition as allegations of "pollution" does not offend the common-sense approach the Fifth Circuit endorsed in *C.A. Turner*.

Motiva contends that the petroleum sludge that allegedly caused the injuries to the *Durisio* plaintiffs was not a "pollutant" because the sludge did not leave the storage tank in which it was collected before it was recycled or discarded.  Motiva cites *Auto Stores, Inc. v. United Capitol Insurance Co.*, 845 F. Supp. 428 (W.D. Mich. 1993), in which the court held that gasoline contained in a tank intended to hold gasoline was not a "pollutant" under a pollution exclusion clause that defined "pollutants" as "solid, liquid, gaseous or thermal irritants or contaminants, including smoke, vapor, soot, fumes, acids, biological elements and agents, and visual esthetics [sic]."  *Id.* at 439.  That case, however, involved breach of contract claims arising out of a dispute over the installation of gasoline containment systems and counterclaims that the defendant negligently installed the systems.  *Id.* at 431.  The case had nothing to do with injuries allegedly caused by exposure to the gasoline.  Furthermore, in rejecting the insurance company's claims, the court noted that if the underlying conduct had involved testing for pollutants (which it did not), "only such damage resulting from the operations being performed, i.e., from the testing itself, [would be] excludable under the [pollution] endorsement."  *Id.* at 437 (footnote omitted).  If anything, this dicta marginally helps United National's argument that the *Durisio* plaintiffs' injuries were caused by their exposure to pollutants.

Motiva argues that when a pollutant is intentionally placed within a container designed to hold that substance, the "discharge, dispersal, seepage, migration, release, or escape" requirement is satisfied only by the release of pollutants from the containment area. *See, e.g., Broderick Inv. Co. v. Hartford Acc. & Indem. Co.*, 954 F.2d 601, 607 (10th Cir. 1992); *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 617–18 (Colo. 1999). Texas courts have held that similar "absolute" pollution exclusions bar coverage for all injuries caused by exposure to pollutants that have been dispersed, discharged, or released in some fashion that causes exposure, including in spaces where the pollutants were intended to be used. *See, e.g., Hamm v. Allstate Ins. Co.*, 286 F. Supp. 2d 790 (N.D. Tex. 2003) (pollution exclusion applied and no duty to defend or indemnify building owner from lessee's complaint that chemicals used in remodeling project caused injury); *Zaiontz v. Trinity Universal Ins. Co.*, 87 S.W.3d 565 (Tex. App.–San Antonio 2002, rev. denied) (alleged injury suffered from worker spraying "smoke and fire odor eliminator" in the interior of a smoke-damaged airplane was subject to pollution exclusion clause because although the substance was used in an intended location and for its intended purpose, there was a release or discharge of a pollutant within the meaning of the clause). In this case, similarly, plaintiffs alleged that toxic components of the sludge were released or dispersed in a fashion that resulted in brain injury to two of the plaintiffs.

Motiva argues that fact issues remain as to the actual cause of the *Durisio* plaintiffs' injuries. The summary judgment record includes a large stack of deposition excerpts, expert reports, hospital and medical records, and witness statements. The documents contain

conflicting conclusions as to whether there were toxic levels of hydrogen sulfide present in the mix tank as a result of the employees' entry and agitation of the sludge from moving about the tank and shoveling up enough to fill a five-gallon bucket; whether the employees were "overcome" and fell into the sludge as a result of heat and excessive clothing rather than because of toxic fumes released from the sludge; whether the employees were injured because of hypoxia from prolonged face-down submergence in the sludge rather than inhaling hydrogen sulfide vapors; and whether the employees were in fact injured as extensively as they claimed.  Motiva posits that the *Durisio* plaintiffs might have been overcome by heat exhaustion or poor ventilation and fallen into the sludge.  Motiva points to testimony by two workers at the scene who claimed that the *Durisio* plaintiffs wore too much clothing into the tank on a very warm day, and to an accident investigation report that lists oxygen deficiency and heat exhaustion as possible causes of at least part of the workers' injuries.  (Docket Entry No. 58 at 13).  Additionally, Motiva cites evidence that the air monitors in the tank did not go off and points to statements by some workers that they did not notice the distinctive, rotten-egg smell of hydrogen sulfide at the scene.  The record includes evidence that the smell and amounts of hydrogen sulfide vapors dissipate quickly but that fleeting exposures can result in significant and permanent harm.

The record does not create a disputed fact issue material to determining the duty to defend or indemnify.  The broad pollution exclusion applies to "bodily injury . . . which would not have occurred in whole or in part but for the actual, alleged, or threatened discharge, seepage, migration, dispersal, release or escape of 'pollutants.'"  The petition

alleges that the injuries the *Durisio* plaintiffs sustained would not have occurred at least in part but for exposure to toxic levels of hydrogen sulfide and other chemicals or vapors that were components of, and emanated from, the sludge. The unambiguous Policy provision excludes coverage for the alleged cause of the *Durisio* plaintiffs' injuries. *Cf. Hydroblast Corp.*, 90 F. Supp. 2d at 733 (interpreting a nearly identical provision and holding that "[t]he Court is satisfied that 'but for' the discharge of Selexol at Amoco's Sundown plant, albeit an isolated discharge, Ybarra and Bounds would not have received their alleged injuries. . . . Accordingly, coverage is excluded for the personal injuries alleged in the Ybarra-Bounds litigation.").

Finally, Motiva cites the Contractors Limitation Endorsement of the United National Policy to argue that the pollution exclusion does not apply. The endorsement provides, in relevant part, as follows:

> Except insofar as coverage is available to the insured in valid and collectible 'underlying insurance' as listed in the Schedule of Underlying Insurance, and then only for such liability for which coverage is afforded under the 'underlying insurance' for the full limit shown, this insurance does not apply to: a. Any liability assumed by any insured under any contract or agreement . . . .

(Docket Entry No. 47, Ex. A-1). Motiva contends that because Hydro Tank assumed liability for the *Duriso* losses under its contract with Motiva, and that liability was covered by a valid and collectible underlying insurance policy issued by American Equity, the United National Policy adopts the coverage of the underlying policy with regard to that liability. As a result, the pollution exclusion simply does not apply.

Motiva relies on *XL Specialty Insurance Co. v. Kiewitt Offshore Services, Ltd.*, 336 F. Supp. 2d 673 (S.D. Tex. 2004), in support of this argument. The court interpreted a standard Contractors Limitation Endorsement identical to the one in the United National Policy, but the court did not hold that the endorsement trumped other policy exclusions. The policy excluded the coverage sought; however, the policy exclusion had an *exception* "to that exclusion if coverage for such liability is afforded under the underlying general liability policy." *Id.* at 676. The court consistently applied both policies, as required under the rules governing interpretations of insurance contracts. *See, e.g.*, *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) (reciting the longstanding maxim that courts interpreting insurance contracts must give meaning to every provision and avoid rendering any provision meaningless). No such exception to the pollution exclusion is present in this case. The Contractors' Limitation Endorsement does not invalidate or create an exception to the pollution exclusion provision in the United National Policy.[7]

United National's motion for partial summary judgment on the basis of the pollution exclusion is granted.

---

[7]     Motiva also cites *Gould v. Arkwright Mutual Ins. Co.*, 907 F. Supp. 103 (M.D. Pa. 1995). It is unclear that the court in that case followed the same law that applies here. Moreover, in that case, the provision that the court held would establish follow-form coverage trumped the pollution exclusion in the excess policy was part of a specific exception to the pollution exclusion. "I. This policy shall not apply, unless insurance is provided by a policy listed in the schedule of underlying insurance, and then for no broader coverage than is afforded by such insurance: . . . VI. to any liability of any INSURED arising out of the discharge, dispersal, release or escape of . . . pollutants." *Id.* at 106–07. In the present policy, the endorsement at issue is not an exception to the pollution exclusion. In addition, the court in that case read the endorsement as creating follow-form coverage, finding that the requirement that the underlying insurance could not expand the coverage of the excess policy also meant that the excess policy had to provide at least the coverage of the underlying insurance. Such a reading appears to be at odds with the Texas canons of interpretation.

**IV.     Conclusion**

United National's motion for partial summary judgment on the ground that Motiva is not an "insured" under the Policy is denied.  United National's motion for partial summary judgment on the ground that Motiva's claim is excluded under the "pollution exclusion" is granted.  The parties must inform the court of any remaining issues to be resolved or submit a proposed final judgment by **January 27, 2006.**

SIGNED on January 12, 2006, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge